May it please the court, my name is Clinton Burr. I represent the parents, Kim Lawson Jr. and Lawson Enterprises. The most glaring fact about this entire case, which is lengthy and complicated, is that defendants did not receive a fair trial at the district court level. If the judge had wanted to give the man a fair trial, he would have allowed a continuance. He would have recognized that this was a very poorly educated individual and allowed him an opportunity to obtain counsel. Kagan. Well, first of all, just a minute. Yes, ma'am. First of all, the trial only went to damages and fine. The trial only went to the damages and the fine, nothing else. That's correct. So the rest of the case is, the basic legal issues are not implicated at all. Yes, they are. And that was in the first appeal, which has to do, much of the case was decided on summary judgment. The first order of summary judgment was on August 7th, 2006. The balance of the issues were decided on summary judgment on November 30th. If witnesses had been there, we would have had a complete resolution of the facts. I'm sorry. I'm not understanding you. On November – up until November 30th, 2006, he was represented by the Bespestian-Krieger lawyers. Yes, he was. So up until that point, there's no problem of the kind that you're describing? Yes and no. In that, on September 30th – I mean, I'm sorry, on September 15th, Bespestian-Krieger was contacted by the county of Riverside and was advised that they were in conflict with what the – with the litigation. With respect to some witnesses who might appear at trial, but they never – so that still has nothing to do with the summary judgment? That's correct. Okay. So up to the summary judgment, there's no problem? Unless you consider the zealousness of the attorney. That's correct. Up until November 30th, there is no problem. All right. So we're only talking, therefore, about the damages and – and fine trial? Correct. Okay. So we've established that after a few corrects. So then the question is this, because I do find it troubling, but this is what I understood in fact happened. The district court – first of all, when the lawyers withdrew, they did arrange for him to meet with another lawyer and he didn't go. Is that right? That's correct. Is there any indication that he had any money to pay any lawyer? He says he didn't. Right. He says he met the attorney, he didn't like him, and he said he didn't want him. Well, the record seems to show he didn't meet him. He did, yes. He said he met the attorney and he advised Best Best and Krieger and the attorney on November 30th that he did not want Mr. Kistler to represent him. And I think Mr. Kistler withdrew. That was a different lawyer. That was the lawyer who was going to represent him. That's the one that Best Best and Krieger wanted to substitute in. No, that's not my understanding. But anyway, leave that aside. What I understood that the district judge was really doing was saying you're not – having not paid Best to Best and Krieger several hundred thousand dollars, there's no indication that you're going to pay any lawyer. He had paid. He had paid almost $200,000 to Best Best and Krieger and I have the checks. But he also didn't pay them $200,000. Over. It's either just before or just after. I have the checks. And actually, I have the checks in my suitcase in my hotel. Here. If you would like them delivered to the court. You didn't answer my question. I'm sorry. Was it reasonable for the district judge, knowing what he knew, to think that this person was not going to hire another lawyer? I don't know. Because he couldn't afford to pay one and he hadn't paid the previous one. I don't know. I suspect not. He did have some income, as he is an Indian. Whether or not he had income to pay the prospective attorney and whether he indicated that to the judge, I do not know. Because that would matter, right? This is a civil trial. He wasn't going to get anybody appointed to represent him. He did make efforts to contact other attorneys to represent him on December 19th. I know that for a fact also. I don't know if he contacted attorneys during the interim. Because on December 8th, after November 30th, was when Best Best and Krieger filed the appellate brief in this case. So he wasn't sure they were gone. He wasn't sure they were remaining. That is what I know. So what makes that arise to the level of an abuse of discretion? Because if the judge had truly intended to give this man a fair trial. Well, stop. That's an if. But is that an if you can count on? I mean, the judge is trying to give a fair trial. The judge is also well into this proceeding for a date that's been established for a long time and has got a busy trial calendar and is juggling lots of things. You could say if a judge intends to give a fair trial, every defendant, every party who comes in says, you know, Judge, if I could have more time, I could make a better case. Well, in that case, sure, take all the time you want. But you know that's not how the court system operates. So what makes this case one that constitutes abuse of discretion that justifies reversal of a otherwise apparently valuable district court judgment? The withdrawal of counsel immediately before when Lawson was relying upon counsel being there, and the second part of it is the criminal nature of the charges against him. Although they were not specifically charged, there were concurrent criminal cases pending for violations of the RCCA in the same actually across the street in the Riverside County Courthouse. Well, I mean, there's no incarceration, no criminal effect from this judgment, is there? This doesn't have any collateral estoppel effect for criminal charges. If he were alive, there probably would have been. How could there be collateral estoppel from a civil judgment? How can a civil judgment represent something that is going to require a criminal conviction? You can be convicted criminally, but because the standards of proof are different, a civil judgment can't constitute the basis for a criminal conviction, can it? Well, the judge said that there was a police action here. The finding of a violation of the RCCA, if it had been adjudicated, and if he were still alive, he believes that he would have been charged criminally. Well, the fact that you say he believes suggests that maybe you don't believe and don't think we can be persuaded that that's the case. Actually, I do think you can be persuaded because it's true. I think that's a good argument, because if he were prosecuted criminally, he would have had his criminal trial and he would have had appointed counsel in that case, and nothing would have happened in this case that would have been in any way relevant or preclusive, and that would have been the end of it. I agree with that. So it's not pertinent. It's just not pertinent. Right. Documents were also submitted which could have been – I mean, there was a pretrial order. He never had the pretrial order. He was betwixt and between. If he were pro se, like so many other people in a civil proceeding, then he would have known what evidence was going to be presented. He would have known who the witnesses were going to be. But as it was, all of this was prepared by Best Best and Krieger. It was handed to the judge. It was never handed to him at the time of the trial. At the time of the trial, he showed up in a pickup truck with bags of documents in the back of the truck. He didn't know what was supposed to be presented and what wasn't. The judge, on his own initiative, and there's good law for this, and it's Ninth Circuit law as well, that if the judge could have asked for these documents to be presented during the course of the trial, the judge could have asked for the list of witnesses to be presented. Instead, the judge said, you know, Mr. Lawson, you may call your witnesses. He had no idea, and he was precluded from getting the opportunity to find out who his witnesses were, because that had been done by his prior attorney. Handed to the judge, the judge participated in the pretrial order. He never got them. So that's what would distinguish. Kagan. But again, where we started from is all of this most goes to the damages and the fine. I'm not completely sure that the damages and the fine matter a whole lot. I assume nobody's paying the $42 million and the $2 million fine, and it's simply kind of a piece of paper at this point. No. That's not really what you're interested in, is it? Yes, it is. Why? Because that judgment is being used next week in a probate proceeding involving Ken Lawson, Jr. and the probate of the will. The U.S. attorney and the bankruptcy trustee are both participating in that probate proceeding, which is going to take place before the BIA on the 19th of March. There is supposition, and I grant you it's speculation at this point, that this man, that Jr. will be prosecuted for the rest of his life for this judgment. And the judgment concerns fines that took place for damages after the United States government took possession of the dump on the 9th of August. The major fires, and it's stated in the record, were between the 9th of August and the end of December. The damages of $2.4 million for injury to the Riverside County Fire Department took place during that period of time, yet he's being pegged for that activity. So I do think it's very substantial. I also believe the Moreos have lost their land. If you go out there, and I have been there, you will see a big fence around it. You will also see this property of the United States, trespassing prohibited. You know, so. And how is that connected up to the judgment? The money judgment, I mean, as opposed to the other judgments. It's connected to the ejectment, which is on the August 24th. No, but the ejectment has nothing to do with the trial issue. That's what I'm trying. That's why I'm trying to separate them out. That's true. However, the judgment is following this man. It is following the Lawson family. The judgment is against somebody who's now regrettably deceased. Correct. So exactly who is this judgment? I mean, how is it that Junior is liable for a judgment against Senior? Because they're attempting to collect from Junior. And we will find out next week at the probate proceeding how they intend to proceed at that point in time. Well, the probate proceeding is usually presumably for Senior's estate. Yes, sir. So how does that constitute a collection against Junior? It may siphon off what otherwise he'd like to inherit, but he's not personally liable for any of this, is he? No. Okay. And so the question is, can this be used as a claim against the estate? Yes. Are you going to – so there are lots of other issues that have nothing to do with the trial that I assume you'd like to discuss. Well, yes, I would. I think that it's important that we focus on the major point. I think that you have, obviously, read the brief. I do believe that no lease was required and that we have a factual dispute regarding that August 7th order of summary judgment because there could have been six Moreos who were members of the partnership, seven Moreos who were members of the partnership, or eight Moreos who were members of the partnership. And if you look at the checks, you'll see that all eight were participating. The second point has to do with the Moreos as necessary parties. If they had been there, we would have known, we would have had live testimony as to who was in possession of allotment 314 and how it was handled. Did any of the Moreos seek to intervene in the action? No, but the Moreos are depending upon me to handle this for them. I have advised them. I do not represent them. I cannot represent them because I think there's a potential conflict of interest. I've told them to get counsel. They've been advised. I've spoken to other people. I have asked other people if they would be willing to participate pro bono on behalf of the Moreos. And so far, no one has, nor have the Moreos sought to intervene. They truthfully have an educational level which would be subpar by any standard. And I don't think they understand. They just know they can't get their land. But the necessary party notion, I mean, ultimately seems to me isn't going anyplace because they could intervene. No one stopped them from intervening. They're not. I mean, the necessary party issue is ordinarily of consequence if the parties are necessary and can't be joined. But these people could be joined if anybody wanted to join them. They just haven't come in. Right? I mean, they could be joined. I didn't know that. And I've studied this very – I mean, are you talking intervention under Rule 20? I've studied this very carefully. I did not know that the Moreos could voluntarily intervene. Of course they could. Obviously they could. In an enforcement action brought by the U.S. Attorney. Well, they could certainly try. I don't know why they couldn't, but they could certainly try. Then I think you may have a good point. Would you like to save some time for rebuttal? Yes. Thank you for coming in today. We'll hear from the government at this time. Mr. Hogg. Thank you, Your Honor. Mark Haig from the Justice Department for the United States. Haig, I'm sorry. This is really a total mess on many levels. But to me, the most troublesome piece is the fact that this trial went ahead without Mr. Lawson being represented. And I would like an explanation of that, a justification for that. The withdrawal of Best, Best and Krieger was very close onto the trial. Ordinarily, in any world that I'm aware of, there would have been a continuous. Best, Best and Krieger met with Lawson, Sr. on November 30th. Right, for a trial on December 19th. I mean, even if everything had gone smoothly from then on, which it didn't, there was still, at most, three weeks for him to go and get another lawyer. That's right. And I think that the point was made earlier, and Lawson, Sr. himself said, when he came into court on December 19th, that he didn't have money to hire another lawyer. The court had been trying to – this case had been pending in the district court for three years. The court had warned the parties several times that it was going to trial on December 19th. That's true. But he thought he had a lawyer until November 30th. Yes. Or until December 7th or until December 19th, but at the earliest, November 30th. Well, he testified himself that he spoke – that his attorneys told him they were pulling the plug on November 30th. But they still had to get – they still had to get the approval of the court, and they easily could have been denied. It happened it wasn't. But he didn't have any definitive determination until after that. I think that the court was – Lawson, Sr. was on notice that the trial was going to go forward. He had – he told the judge that he didn't have the money to hire another attorney. Is that the ultimately determinative factor? I mean, it's the only thing that I can think of could have possibly justified this, that it wouldn't have made any difference, because he couldn't have gotten a lawyer. Well, that – I think that's one factor. Did the judge make a finding about that? That was Lawson's own statement, that he didn't have the money to hire a lawyer. Well, then what did he want the continuance for? I thought he wanted the continuance to find a lawyer. He came in on – And even if he wasn't going to get a lawyer, why was he entitled to a continuance to be his own lawyer, to learn the case and do it? Well, he – I guess there are a couple of points that the district court relied on in deciding to go forward. The first is, as I think was pointed out earlier in the questions, most of the legal issues in the case had been disposed of earlier by motions when Lawson was still representing counsel. Well, absolutely, but there was still $42 million at stake. It's not peanuts. It's – that's right. It's not peanuts. The – Lawson Sr. was there, and the questions about what was the condition of the site, what happened on the site, were there fires there, did the firemen Lawson Sr. was the guy who ran the facility, and he was there to serve as a fact witness. Judge Larson was – Do you think if this was Chevron or somebody like that, that they might not have cross-examined the witnesses about the actual cost of the cleanup and so on? I'm sure he would. I'm sure they would, Your Honor. But the judgment here, the $42 million judgment, is not – that $42 million is a cap on reimbursing the United States for costs that are actually incurred by the United States in cleaning up the facility. There were three evidence of what the response costs were going to be, ranging from $9 million to $112 million, I think, and the court did not make a finding that this is the amount of the cleanup costs. It said, Lawson, Enterprises, you will be liable for up to $42 million after the government incurs them. The government can come to you and seek to collect them. And then the penalty only kicks in once the cleanup costs are satisfied. So if it only is a million dollars to clean up the site, the United States only can seek to recover a million dollars from Lawson. And at the end of the day, we're talking about a bankrupt and deceased defendant and a defunct corporate defendant, the partnership. So this is really all kind of academic as to whether there's any money anywhere that the United States is ever going to collect on this judgment. When did the district court learn that Lawson had no lawyer? I believe the first week in December. I think it was December 5th that they – that Best Best Integrity was filed. About two weeks before the trial. Two weeks before the trial. And did Lawson indicate he was searching for replacement counsel? I have – the transfer page is in the excerpts. And he came into court that morning and said, I had to file for bankruptcy because I have no money and I have no attorneys. Did he indicate affirmatively that he wanted to represent himself? Yes. He actually filed a substitution of counsel. But he did indicate affirmatively that he wanted more time. Yes. Yes, he did. He did, and the court denied it. And I think that the district court also viewed the bankruptcy petition as an attempt to delay the proceedings. Well, he obviously wanted to delay the proceedings, but it seems they had a pretty good reason. Well, I'm not sure what – at the end of the day, what evidence he would have put on that would be material to any of the findings here, because, I mean, if he had someone to cross-examine the witness, the evidence that was put on about the costs of cleanup, that wouldn't change the fact that this – I mean, and so the cost of cleanup is only going to be $30 million or $20 million or $1 million. At the end of the day, the judgment only requires him to pay the amount of cost that the government incurs. And $2 million in fine. $2.2 million in – Also not peanuts. Excuse me? Also not peanuts. Not peanuts and also unlikely ever to be recovered by the United States because the – because he's bankrupt and he's dead and the corporation is defunct. And what about the estate? Well, the – Are you representing that you're not going to try and get any money out of the estate? If it turns out that there are assets in the estate, then the United States is entitled to seek to recover those. But even before this judgment, the bankruptcy finding indicated that Lawson Sr. had debts of $313 million and assets of about $160 million. So the estate was underwater even before this judgment. And whatever asset – I am essentially saying that this case could totally moot out next week because you could go to the probate court and find out that there is no money and you will go home and there would never be any collection on this debt. I think as a – And we could just vacate it and we could all go home and that would be the end of it? No, Your Honor. Because the probate proceeding that won't resolve the bankruptcy proceeding, the bankruptcy proceeding can stay open for a while. If it turns out that there are assets someplace, they would be part of the bankruptcy estate and under the jurisdiction. So you're not willing to walk away from the monetary judgment on the ground that it's never going to get collected? That's right. That's right. But in the probate proceeding, there's a small set of assets, I think a home, a personal vehicle, that are exempt from the bankruptcy, which conceivably could pass through the probate proceeding to the heirs. But the United States, to the extent that those assets are exempt from the bankruptcy estate, the United States is not going to – I don't believe the United States can go against any of those assets. This judgment doesn't go to any Indian Trust assets, so the judgment doesn't affect in any meaningful way any interest of Kim Lawson, Jr. And that goes to the issue of his standing, which we've raised in our briefs. The part of the judgment that you have to keep is really the non-monetary judgment. I'm not saying you have to give up the monetary judgment, but there are pieces here that you would need to defend in order for the United States to have justified retaking the possession of the property and doing the remedial work, which all the money is being spent for, but it was the court's order that authorized that remedial work in the first place. That's right, Your Honor. That's right. But to clarify, the United States now is in possession of the property, but the United States has owned the property all along. That gets me to a somewhat different question, which I would like to raise before we let you leave, and that is I have one concern because the United States is performing multiple functions here, and that's the government. That's what it does sometimes. But the justification given for why it was not necessary for the, what, the Elatis, the Moreos to be parties, is that the United States is there. We're actually the fee owner, and we're here as a trustee, so we're representing those interests. But I see some problem because the United States isn't simply there on their behalf. The United States is there at least as much, and it seems to me even more, the driving force is the environmental enforcer role. I take a step back and say exactly what is it the United States is doing that's for the benefit of the Moreos, and I'm kind of hard-pressed to see how it works out real well for them under the circumstances. Well, the United States brought this action on behalf of the, or in the interests of the Moreos, and as the fee owner of the land. Okay. Well, it did that, but the effect of it is to cut off what we are told is the primary income for the Moreo family. So exactly how is that in their best interests? Well, the allotment that the Moreo family owned and was getting a stream of income from was being, had been turned into a health hazard. But the problem is that they had several interests here, and some of them it seems to me the United States was not representing. They were representing their interests perhaps qua landowner, but they weren't representing their interests qua either employee or partner or whatever who was driving income from this use of the land. So it seems to me that this is a situation where the Moreos had several hats here, and some of them were arguably being represented, but others of them were not. Well, the Moreos, as I believe you pointed out before, Your Honor, could have intervened in this. Well, is that true? And sought to intervene. Is that so? I mean, would you have imposed their intervention if they had tried to make it? I don't know that we would have or not, but they certainly could have sought to do so. And certainly if they had wanted to intervene as defendants, they could have. But it's the government's position that they were not partners in this business and that under- Right, but their position may be that they were. They were employees or there was something. They were driving income from this business. Right. Well, and as an employee, I don't think an employee has the right to come into court- But they weren't really being paid as employees. They were being paid on a percentage basis. So they had an interest in the profits of the business of some kind. They did. They did. They did. And the dump was a health hazard, and the government worked for many years in attempting to resolve the problem without shutting the business down. That's the government's concern as environmental enforcer, and that's certainly valid. But can you acknowledge that at least at some level there is tension between the two roles of being trustees for the people getting money out of the business and environmental enforcer trying to shut the business down? And it may well be the government tried to reconcile that by working for many years to keep both balls in the air. But in the end, what we have here is an adjudication that cuts off the income that they were getting, purportedly being done on their behalf. And that seems peculiar. Well, there is- I'm from the government. I'm here to help you. I hear that a lot now that I'm a judge, and there's some feeling of that here. Well, there is a tension there, Your Honor. But as the fee owner in trust for the beneficiaries, the United States has to protect the trust corpus. And allowing an unlicensed and noncompliant dump to continue operating on the fee land is a detriment to the morenos, to the beneficial owners. I mean, you could- Well, look, it may not be-I mean, plenty of companies have determined in their own economic self-interest that it isn't a detriment to them. They have taken their own land, and they have used it for similar purposes because it's in their economic short-run interest. Now, I mean, once it becomes clear under CERCLA and RCRA and all that that you're going to have to pay for the cleanup, the decisions made might have been different. But it's not as if this was a decision that other – plenty of other landowners haven't made. Well, because of the odd legal status of the tribal lands, if a private landowner on California land would not be able to open a facility like this- Was the necessary parties issue as such raised in the district court? Yes. Best Best and Krieger argued- And if they had been determined to be necessary parties, what would have happened? Presumably, they would have been offered the right to intervene. Right. And they were – and the Elatis were aware of the action. Six of them submitted affidavits in support of Lawson and Keeper. And am I right that the main reason usually for adjudicating a necessary party issue is whether they're going to turn out to be indispensable parties who are not joinable? But these people were joinable. Yes. Right? That's correct. So it's really – it's a non-issue. They could have been joined, and if they had wanted to join, they could have attempted to join. But certainly Lawson – the Elatis are not parties in this case, and Lawson and Lawson Jr. don't speak for the Elatis. If the Elatis had wished to participate, they could have sought to do so, but they didn't. Well, Lawson Jr. is either an Elati himself or a potential Elati, so he does have an interest. Right? Because his mother was an Elati. Lawson Jr. is not an Elati himself. His mother owns a- Who may or may not be alive, apparently. That's right. That's right. And his mother owned an undivided one-eighth interest in the Elatis. Which he presumably will inherit one day. So he has an interest. We actually don't know that, Your Honor, but even assuming that that's the case, because it's possible as shares get fractionated more and more that the land goes to the tribe rather than to individual fractionated owners. But in any case, this judgment does not purport to address the rights of the Elatis as beneficial owners. The only thing that this judgment does is it shuts down the unlawful operation on the land. And in doing so is based upon, and this really gets back to my concern, it is based upon not the government acting solely as environmental regulator, but the core of this is that the lease, this license, this agreement, whatever you call it, was a lease that required the approval of the BIA. The BIA didn't approve, and so we're shutting it down. And that's, as Judge Berzon noted, action on behalf of somebody who might not have wanted to take that action or might not have been in their personal best interest, but the government is asserting its authority as trustee for the Elatis to have a substantial impact, that is take away 90 percent of the Elatis' income and deny them access to their land. Now, I'm not saying there are parties here or that there's a Fifth Amendment claim or anything like that on behalf of the Moreos here, but the whole thing seemed odd to me as I sit here and look at what seems to be a straightforward environmental action, only it's not being taken based on the usual federal statutes that empower the federal government. For the most part, it's being taken because the landowner is voluntarily shutting itself down, only not really. I don't know. I have some difficulty putting the pieces together to understand exactly how it is the – this form of paternalism is a good thing that should be encouraged. How is this really acting in the best interests of the Elatis? The – there are many instances where a trustee may take action that the beneficiary may or may not agree with. But there is the fact that the United States here has somewhat conflicting interests because it has a very, you know, admirable interest in the environmental status of this land with regard to all the surrounding people and RCRA and so on. And so the United States is, as Judge Clifton points out, in an unusual position here because it is not well-positioned to be acting in the sole interest of the Elatis as opposed to in the – in its other hat, as protector of environmental safety. And as you point out, the health hazard. The health hazard isn't to the Moreros. It's to everybody else. It's to the Moreros, too. It's to the people living on the reservation. I think many of the Moreros live within a mile or two of the – All right. But that's not why they're doing it. They're doing it because of everybody else, which they ought to be doing. But whether they ought to be doing it with this hat on is the problem. Well, they're doing it for the Moreros and everybody else. The action was brought in the first instance at – in response to a complaint by one of the Elatis, one of the Moreros, and the tribe. So that's what set – that's what set the action in motion. But this – certainly, Judge Clifton, this tension that you're describing exists. But that is tension that is in the law, that's reflected in the statutes. The General Allotment Act is what sets out this basic framework that the Indian beneficial owners of the land can – it's their land and they can use it, but they can only use it for certain purposes. Well, but is – I don't see where it is inherent in the statutes, at least not the Indian statutes, because those don't assume the existence of competing federal interests. Well, what they assume is that the Secretary of the Interior has the authority to approve uses of these lands. This may be much like the last case, which you probably observed, and this may be more of a message to be taken back than something that will actually have an impact here. But it seems to me there are circumstances where the government seeks to act as trustee on behalf of Native Americans and, in fact, seems to be pursuing an environmental enforcement agenda. There is tension there that's going to cause trouble. Now, I don't know why this action couldn't have been – I mean, it was filed on behalf or at the request of both the Department of the Interior and the EPA. This comes as an EPA action. It's clean. But to come in on behalf of the allottees and, in effect, take a dive, because what you're proposing to do as the landowner is take away the allottees' benefits, it strikes me there's a claim of breach of trust on behalf of the allottees in some circumstances. I'm theoretical here. I'm not saying that's what happened here. But I think there's got to be real concern about wearing two hats and acting with the authority as trustee when you're actually pursuing your own environmental agenda. And it's an admirable agenda. But if the government is going to pursue an environmental agenda, it's probably better doing that with an environmental hat, not purporting to act as a trustee for the beneficiaries, who in this case don't seem to really benefit all that much. But that's an observation more than something that speaks directly to the facts of the case. I'll take the advice that you gave to the last counsel and say thank you, Your Honor, and I'll take that message back. Thank you. Do you have a little time for rebuttal if you wish to use it? Yes, sir. I would like to. Thank you very much. Number one, the land is very valuable. There's an appraisal, which I believe is in the file, and dates from the efforts to settle the case, and I believe that the land was appraised at $28 million. Second, I think the court can take it. How is that a bad thing? What? How is that? I mean, frankly, that seems to me this may be a bonanza for the alakes, the people for whom I've been professing concern. Yes, sir. It is. This land is valuable, and you can take judicial notice. It's still my understanding is once it will be cleaned up, and they'll be able to use it as they did. It's been cleaned up, and they have done no further work on it since April of 2007. And so why can't the alakes go in and do as they please with it as usual? Because there's a fence around it, barbed wire. Well, that's another problem. That's another lawsuit, as far as I can tell. I mean, the land is still theirs in whatever sense it was theirs before. If it's cleaned up, they can use it. I don't know what the problem is. Because they can't get it back. Because they have no rights to get it back. Why? Because it's not recorded by a deed. Because it's Indian land, and their rights are strictly registered. Well, it's Indian land. So I'm saying they have whatever rights that they ever had. Except they don't have possession. And under Indian law, possession is everything. If they don't have possession, that seems to be its own problem. They ought to have possession, as far as I can tell. They should have possession. They do not have possession. But that has nothing to do with this lawsuit. Well, they came as a great surprise to the Moreos when they found they were ejected from the land. Because they cannot get on their land. There's nothing that I can see in any of the judgments here that ejects the Moreos from their land. In fact, if it's valuable, I'm sure there's an attorney out there who's willing to pursue their claim to get it back. It's very valuable because it is wedged between a development of six golf courses and Interstate 10, which is the highway on the edge of the Salton Sea. And it was the subject of an article in Fortune magazine and of two articles in the Los Angeles Times. The second thing that I'd like to bring up, if I may, has to do with the paternalism argument, which you raised a few minutes ago. There are several cases, the most important of which is Provident Tradesman, which is where the Ninth Circuit ruled that when a party's interests need to be protected, the United States Court of Appeals can sui sponte, take on action and protect the absent party. The other cases are Many Goats and Truckee Carson Center, where the government doesn't always represent the interests of individual Indians. Both Many Goats and Truckee go to the individual Indians, and Provident Tradesman goes to the issue that you brought up, and it's two of the three or nine circuit cases. And the third, I believe that when the partners were ejected from the land in the August 7th order, and the fence was erected and they could not enter the land, they considered that to be ejection. Thank you very much. Roberts. Okay. Thank you both for your arguments. The case just argued will be submitted for decision, and the Court will stand in recess for the morning.
judges: Hawkins, Berzon, Clifton